MORTIMER A. HARRISON, Respondent, v. HEBREW COMMUNITY OF BOROUGH PARK, Appellant.

Second Department, July 22, 1921.

**Contracts — action to recover damages for breach of contract by defendant to bury plaintiff's father — evidence — evidence inadmissible as to whether defendant made profit by selling graves — question of performance by defendant should have been submitted to jury — measure of damages.**

In an action to recover damages for an alleged breach of contract by defendant to furnish and supply everything necessary for a proper and fitting burial and funeral for plaintiff's father in accordance with the rites of the defendant, it appeared that the defendant owned the cemetery which was under the control of another cemetery corporation; that the plaintiff not being satisfied with the grave offered bought another grave from the defendant; that the defendant conducted the funeral services up to the cemetery gates where admission was refused by the other corporation on the ground that it had not been notified in time as to opening the grave, and that the plaintiff refused defendant's offer to have the body placed in a vault till the following day and then buried, but secured another burial permit and himself arranged for and had burial services conducted on the following day and his father buried in another cemetery.

*Held*, that it was error for the court to admit testimony, over the objection of the defendant, as to the defendant's desire to make money out of selling burial plots.

The trial court should have submitted the question to the jury whether the defendant did not in fact perform its obligations under the rules and regulations governing the funerals of its members as required by the contract in question.

If there was a breach of the contract by the defendant the measure of plaintiff's damages was the expense of keeping the body over night and for a coach or carriage for the family on the succeeding day, in accordance with the by-laws of the defendant, and the damages should not include the total expense paid by the plaintiff in conducting the funeral services for his father on the following day.

It was error, therefore, to refuse defendant's motion to strike out testimony as to the cost of the new plot in which the defendant's father was buried, gratuities or tips to the gravediggers in that cemetery, expenses for automobiles, and expense for a rabbi at the second service.

APPEAL by the defendant, Hebrew Community of Borough Park, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Queens on the 7th day of July, 1920, upon the verdict of a jury,

and also from an order, entered in said clerk's office on the 9th day of July, 1920, denying defendant's motion to set aside the verdict and for a new trial made upon the minutes.

*Abraham Wielar* [*Harry Aaron* with him on the brief], for the appellant.

*Stanley C. Fowler*, for the respondent.

KELLY, J.:

The complaint alleges that David Harrison, the father of the plaintiff, died on May 18, 1919; that he was a member of the defendant religious corporation; that on the said eighteenth day of May the defendant contracted with the plaintiff in consideration of $410, " to furnish and supply everything necessary for a proper and fitting burial and funeral of said David Harrison, in accordance with the rites of said defendant;" that defendant agreed to furnish and supply all of the necessary raiment, undertaker, undertaker's services, coffin, hearse and coaches, to conduct the funeral ceremony on May nineteenth, and to furnish a proper burial place for the body of said David Harrison, in the Mt. Judah Cemetery, Cypress avenue, Queens county, and at said burial place, on May nineteenth, to officiate at and conduct a proper and fitting burial ceremony over the remains of the deceased in accordance with defendant's custom and the religious belief of defendant and said decedent. The plaintiff alleges that he agreed to pay and did pay defendant the sum of $410 for the purposes above set forth, but defendant failed and refused to perform its agreement, and that by reason thereof the plaintiff was obliged to and did furnish the necessary raiment and funeral coaches and a burial place in a cemetery other than Mt. Judah Cemetery, and that the burial by reason of defendant's neglect was had without defendant officiating thereat and performing its rites and ceremonies.

The plaintiff alleges that he was compelled to expend money, and was " subjected to great physical and mental pain and torture " in securing a new burial place, so as to bury deceased " in any way according to the rites of his church "

APP. DIV.— VOL. CXCVII.        56

and in the time and manner prescribed by the church. He alleges that he has been damaged in the sum of $5,000.

The defendant answered with a general denial, and for a first separate defense alleges that on May 18, 1919, it agreed with plaintiff to sell and convey to him two graves in the cemetery named for $410, and that it executed and delivered to plaintiff a deed to said two graves. For a second separate defense it alleged that Mt. Judah Cemetery, which was the property of defendant, was in the control of and was operated by Highland View Cemetery Corporation, which had the sole and exclusive charge of digging the graves in Mt. Judah Cemetery. Defendant alleges that David Harrison, deceased, was an honorary member of the defendant's organization, and as such was not entitled under the constitution and by-laws to " any burial rights," but that on May eighteenth the defendant " gratuitously and without consideration promised to supply a burial for said David Harrison, such as a regular member in good standing in said organization is entitled to." Defendant alleges that Mt. Judah Cemetery was and is " operated and controlled by persons other than the defendant," and that on May nineteenth, at the time of the funeral, the Highland View Cemetery Corporation failed to dig the grave although defendant in time demanded that the grave be prepared; that the Highland View Cemetery Corporation offered to dig the grave the following day, but that plaintiff refused to avail himself of the offer and caused the remains of deceased to be interred elsewhere.

The evidence in the record shows that on the day of the death the defendant offered voluntarily to prepare the body for burial, to provide an undertaker, a hearse and one coach, which was provided for by the by-laws of the congregation, to conduct religious services and provide a grave in Mt. Judah Cemetery, which was a cemetery or burial ground owned by defendant in the larger Highland View Cemetery. The defendant claiming that under its rules a man and woman could not be buried in the same grave, the plaintiff, who did not live with his father and mother but at Far Rockaway, objected to this arrangement and insisted that a grave be provided in which his mother, still living, could be buried with her husband when the time came. Thereupon an agree-

ment was made by which defendant sold to plaintiff two graves in another portion of Mt. Judah Cemetery where the husband and wife could be buried together; that the price agreed upon was $400 and $10 for a " watcher." The plaintiff agreed to this, and a deed was executed by defendant conveying the two graves to plaintiff. Defendant supervised the funeral, employing an undertaker, conducted the funeral services at the synagogue and gave notice to the Highland View Cemetery on May nineteenth to open the grave. It is apparent that the community and its officers were ready in good faith to bury the deceased according to the rites of their church. The plaintiff, living in Far Rockaway, says he is not an orthodox Jew, and with the widow and the children, wished to show all honor to the deceased. They wished the decedent buried according to the orthodox Hebrew rules, but these rules called for very simple ceremonies and a very simple funeral. It appears that the members of the community were working people, each of whom was called upon to contribute twenty-five or fifty cents towards the expenses of the funeral of a fellow-member. The undertaker's bill, paid by defendant, was $26.50.

The plaintiff and his sister respected the old gentleman's orthodox religion, but it is very evident that they resented the simplicity, etc., enjoined by these regulations. Plaintiff says: " Of course, I did not know anything about Jewish affairs, how they go on with those things. I never had experience." The plaintiff, instead of accepting the grave provided under the rules of the Community, bought and paid for two other graves in what he considered a more suitable part of the defendant's cemetery, where the husband and wife could be buried together, and he and his family and friends followed the body to the cemetery in a retinue of automobiles. When the funeral arrived at the cemetery gates it was five o'clock in the afternoon and the Highland View Cemetery officials who controlled the cemetery would not permit the funeral to enter, claiming they had not received timely notice to open the grave. The president of the defendant Community, who was present, endeavored to obtain admission, offering to pay any additional charge which might be made, but without success. He then offered to place the body of

the deceased in a receiving vault close by and to furnish "watchers" from the sixty to seventy members of the Community who were present to do honor to the deceased and who offered voluntarily to remain with the body over night. And the president proposed that the interment could take place the following morning.

But the plaintiff, possibly under the strain of the situation, would not listen to the offer of the Community. He denounced the defendant and the cemetery, stating that he would not allow the body of his father to be interred in such a place, and the unfortunate incident culminated in threats of bodily violence against the officers of the defendant corporation, who were obliged to escape as best they could. The plaintiff immediately proceeded to an adjoining cemetery, where he bought two graves for $210. He had his father's body placed in the receiving vault of the new cemetery, and on the following morning he conducted practically a new funeral with his relatives and friends, a rabbi from Far Rockaway, and a new lot of automobiles. He was liberal in his gratuities to the cemetery employees, and generally the obsequies were conducted in entire accordance with his wishes.

The plaintiff still has the deed by which the defendant Community conveyed to him the two graves in Mt. Judah Cemetery. Plaintiff makes some point about what he says is a mistake in his name. He is described in the deed as "Morris" Harrison, whereas he says his name is "Mortimer A." Defendant's officers say he told them his name was "Morris," and his father's will describes him as "Morris Aaron Harrison." There is no doubt about the identity of the grantee, and plaintiff retains the deed and is the owner of the two graves. He has never offered to surrender the deed.

The defendant Community did all that it was obliged to do up to the time the funeral left Borough Park. There is complaint that it did not start on time, but that is not unusual. Defendant's president says that the hour was fixed for two o'clock so that the members of the congregation could attend, as they were all working people. They did not get away until two or three o'clock. There is no legal grievance in that. There were sixty to seventy-five members of the

Community at the cemetery, all coming to honor the dead
man. The Community paid the undertaker and for the one
coach, as provided in the by-laws, and the members paid for
their own coaches, automobiles or whatever they used. The
plaintiff, and the other members of the family of deceased,
came in automobiles, and the plaintiff asks seventy-five dollars
for automobile hire on the day of the funeral and seventy-five
dollars more for the next day.

The cemetery authorities based their somewhat arbitrary
refusal to admit the funeral at five o'clock, on the ground that
they did not receive notice to open the grave until three
o'clock, whereas it should have been given by noon. The
defendant's messenger took the precaution of going to Far
Rockaway to have plaintiff's check certified before giving the
order to open the grave. The defendant's officers denied all
knowledge of the cemetery regulation as to notice before
noon time, and gave evidence that the cemetery authorities
had previously accepted orders to open graves at any time,
and they produced a circular issued by the superintendent
after the funeral in question, providing for an extra charge
for funerals arriving after* five P. M., and that no funerals
would be admitted after six P. M.

The learned trial justice opened the door wide for the
plaintiff and the jury on the question of damages. Plaintiff,
after a fashion, on the motion to dismiss, said that while he
would not withdraw his claim for damages to his feelings,
he would concede that " the law is against any such thing,
* * *. I do not elect, I am forced. The Court: Of course,
you can only recover here for breach of contract. Mr. Fowler:
I propose to follow the law, if the Court please."

The court said to the jury of the plaintiff's right to recover:
" He is entitled to recover such damages as you can say
reasonably and proximately flow directly from that breach.
* * * The damages are such as will put the plaintiff in
the same position, as near as money can do it, that he would
have been in if the contract had been fully performed by
the defendant." It is apparent from the entire charge that
the learned judge practically charged the jury as matter of
law, that there had been in fact a breach of the contract by
defendant. It does not appear that the matter was directly

called to his attention by request or exception. He itemized plaintiff's claims for damages which he totaled at $464.25, including $210 for the new plot, mourners, gravediggers, automobile hire, expenses for the second rabbi, for the shroud, etc., but there is no word about defendant's performance of its obligations · or its responsibility for the refusal of the cemetery superintendent to admit the funeral on its arrival at the cemetery. He told the jury that it was true· plaintiff had received the deed for the two lots (for which he had paid $400), and that it was still in plaintiff's possession, and told them, " As the law seems to be in this case, it is perfectly proper that an allowance should be made for that plot." And he proceeded to tell the jury that there was evidence that such plots were only worth $50, and " It is for you to say, gentlemen, what allowance should be made by reason of that fact." But the jury had no right to rescind plaintiff's purchase of the two graves, nor did plaintiff ask rescission.

In other words, although plaintiff concedes that he purchased the two graves for $400, and although he received and retained the deed in fee simple for the two graves, the jury were allowed to say that they were really worth but $50.

There is no dispute that plaintiff voluntarily purchased the two graves for $400. He was not forced to buy them. The Community offered him a grave for his father without charge. He insisted on these two graves in a particular location, he refused two graves " next to the children " and bargained with defendant, getting the price down to $400.

The learned trial judge over objection and exception interrogated defendant's president, Silverman, as to the profit accruing to the Community in the sale of the graves, and plaintiff's counsel over objection and exception cross-questioned Silverman as to the Community's desire to make money out of selling the plots. Silverman was a collector for Burns Brothers, coal dealers. None of the officers of the Community received salaries. I think this evidence was improperly elicited and admitted over exception. The same error occurred in the evidence of Langridge, the superintendent of Highland View Cemetery, a witness for plaintiff.

I think the trial justice should have submitted to the jury, first, the question whether the defendant did not in fact

perform its obligations under the rules and regulations governing the funerals of its members. Did they not convey the two graves bargained for, and conduct the funeral up to the gates of the cemetery? On the evidence there is grave doubt whether the defendant was responsible for the refusal of the cemetery superintendent to admit the funeral. But in any case it would seem that the damage growing out of that refusal was the expense of keeping the body over night and for a coach or carriage in accordance with the by-laws for the family on the succeeding day. I also think that error was committed in refusing over exception defendant's motions to strike out testimony as to cost of the new plot in Mt. Nebo Cemetery, gratuities or tips to gravediggers at Mt. Nebo Cemetery, expenses for automobiles on May nineteenth and May twentieth, expense of taxicab to obtain new burial permit on May nineteenth and expense for a rabbi on May twentieth.

While this court might reduce the recovery, still in a case of this description it would appear that the interests of justice are best served by ordering a new trial.

The judgment and order should be reversed and a new trial granted, costs to appellant to abide the event.

BLACKMAR, P. J., RICH, JAYCOX and MANNING, JJ., concur.

Judgment and order reversed and new trial granted, costs to appellant to abide the event.